JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave., 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

DOUGLAS J. MCNAMARA (*pro hac vice forthcoming*)
dmcnamara@cohenmilstein.com
KARINA G. PUTTIEVA (SBN 317702)
kputtieva@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGAR OGANESYAN and MATTHEW ELY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAYPAL, INC. and PAYPAL HOLDINGS, INC.,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **Violation of Electronic Privacy Act, 18 U.S.C. §§ 2510, et seq. (ECPA);**<br>2. **Violation of Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq. (CFAA);**<br>3. **Violation of Cal. Business & Professional Code §§ 17200 et seq. (UCL);**<br>4. **Restitution and Unjust Enrichment;**<br>5. **Interference with Prospective Economic Advantage;**<br>6. **Conversion;**<br>7. **Violation of Cal. Penal Code §§ 630 et seq. (CIPA); and**<br>8. **Violation of Cal. Penal Code § 502 (CCDAFA).**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Edgar Oganesyan and Matthew Ely ("Plaintiffs") bring this Class Action Complaint, on behalf of themselves and all other similarly situated social media influencers, bloggers, and other content creators, against Defendants PayPal, Inc. and PayPal Holdings, Inc. ("Defendants" or "PayPal") for wrongfully and surreptitiously stealing their rightfully earned affiliate marketing commissions through the use of Defendants' Honey browser extension. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## **INTRODUCTION**

1.    Affiliate marketing is a powerful and popular tool used by online merchants across various industries, including retail, technology, software, health and wellness. It is a type of online marketing that involves a partnership between businesses (online merchants) and individuals or companies (social media influencers, bloggers, and other content creators). The popularity of the affiliate marketing strategy stems from the fact that it is both an effective and cost-efficient strategy that drives sales by leveraging the reach and credibility of social media influencers, bloggers, and other content creators ("affiliates" or "Influencers"). Instead of having to invest in costly marketing campaigns, merchants pay only when results are achieved (i.e. products are sold). Influencers promote the merchant's products on their social media platforms that they have built over time, such as YouTube channels, Instagram or TikTok accounts, or blogs, and merchants pay them commission for the products sold through their promotional efforts.

2.    Affiliate commissions are tracked through unique affiliate links. These links are provided by the online merchants (or third-party affiliate networks who facilitate the process) to the Influencers, who then post them on their social media platforms. The affiliate links contain a code unique to the Influencer (an affiliate ID and the coupon code), i.e., affiliate source information. When a consumer clicks the affiliate link on the Influencer's platform and arrives on the merchant's website, the code unique to the Influencer is saved in a cookie on the consumer's browser. When the consumer completes a purchase, the Influencer's unique information contained in the cookie is sent to the merchant, identifying the Influencer as the one responsible for the sale, and allowing the merchants to accurately attribute sale to the specific Influencer.

3.      In December 2024, MegaLag, a YouTuber known for his tech investigations, exposed PayPal's Honey scam: The Honey browser extension, which is free for consumers to download and use, is advertised as a tool that helps consumers save by searching for coupons on the internet and applying those coupons to the consumer's transaction.[1] However, when a consumer clicks on the "Apply Coupon" (or another button) on the Honey pop-up, Honey manipulates the cookie: it deletes the Influencer's unique information and injects source code with its own information. As a result, when the purchase is complete, it looks like the sale is attributable to Honey, not the Influencer, and the merchant sends the commission that rightly belongs to the Influencer instead to Honey.

4.      Plaintiffs bring this class action lawsuit, individually and on behalf of all other similarly situated Influencers, against Defendants, for Defendants' deceptive, unfair and unlawful practice of stealing affiliate marketing commissions from Influencers via the Honey browser extension, seeking  damages, restitution, injunctive, declaratory and other equitable relief, pursuant to Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, et seq., Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., California's Unfair Competition Law, Cal. Business & Professions Code §§ 17200, California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq*., Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, and counts for conversion, unjust enrichment, intentional interference with prospective economic advantage.

## **PARTIES**

5.      Plaintiff Edgar Oganesyan is, and has been at all relevant times, a resident of Los Angeles, California. He is a social media influencer who runs a YouTube channel called TechSource with 3.86 million followers.

6.      Plaintiff Matthew Ely is, and has been at all relevant times, a resident of Louisville, Kentucky. He is a social media influencer and co-founder of ToastyBros, LLC, a technology-focused company which operates a popular YouTube channel called ToastyBros with more than 745,000

---

[1] MegaLag, Exposing the Honey Influencer Scam (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk&t=389s

followers. ToasyBros, LLC also operates several other channels with a total of approximately 140,000 followers.

7. At all times relevant herein, Defendant PayPal Holdings, Inc. was a California corporation, doing business in the State of California.

8. At all times relevant herein, Defendant PayPal, Inc. was a California corporation, doing business in the State of California.

<u>**JURISDICTION AND VENUE**</u>

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1367.

10. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendants.

11. This Court has personal jurisdiction over Defendants because they are headquartered in San Jose, California, and conduct significant operations in this district.

12. Likewise, Plaintiffs are California residents whose rights were violated in the State of California by Defendant.

13. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (b)(3).

<u>**FACTUAL BACKGROUND**</u>

A. <u>**Affiliate Marketing**</u>

14. An affiliate marketing strategy is based on a formation of partnership between a merchant-partner (i.e., an online merchant) and an affiliate-partner (i.e., Influencer). Merchants set up affiliate programs, which offer Influencers the opportunity to sign up to promote merchants' products in exchange for affiliate commissions paid by merchants to Influencers, based on each sale an Influencer generates.

15. Merchants can set up affiliate programs on their own or with the help of an affiliate network, a third party that acts as an intermediary between merchants and Influencers and facilitates their partnerships.

16.    Affiliate networks facilitate the partnerships between merchants and Influencers by connecting merchants with Influencers, generating unique affiliate links for Influencers to share with their audiences, and tracking clicks, conversions, and sales generated by the Influencers.

17.    Affiliate marketing programs are designed to increase traffic to merchant's websites and promote product sales by leveraging influence of individuals who have built social media platforms with a large number of followers/subscribers and who have, over time, built trust and credibility with their audiences.

18.    Affiliate marketing programs are intended to compensate Influencers only when their advertisement or promotion of products causes a subscriber/consumer to take action to purchase a product on the merchant's website.

19.    Accordingly, Influencers earn commissions, payable by the merchant directly or through the affiliate network, when the following sequence of events occurs: (1) the Influencer promotes a product, (2) a consumer clicks on an affiliate link on the Influencer's webpage or social media platform and is directed to the merchant's website, (3) the consumer places an item in the cart and completes the checkout process.

20.    Merchants' obligation to pay commissions is tracked (by the merchant or affiliate networks) primarily through the use of the affiliate links.

21.    The affiliate links contain a unique identifier assigned by the merchant or an affiliate network to an Influencer. When a consumer clicks on an affiliate link, a cookie – a collection of data that associates information with a given Influencer – is placed on their browser, which merchants and affiliate networks use to confirm that a consumer was directed to the merchant's website from a specific Influencer.

22.    A cookie usually expires after a certain period of time (e.g. 14 or 30 days), which means that if the user engages with the merchant website and completes a transaction at a later time within the set time period, the merchant and/or affiliate network determines – based on the data in the cookie – which Influencer, if any, should be credited with the sale and receive the commission.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.**      **The Honey Browser Extension Scam**

23.      The Honey browser extension is available to consumers for free to download and use.

24.      It can be downloaded from the Chrome Web Store and many other web browser stores, including Firefox, Microsoft Edge, and Safari.

25.      PayPal advertises Honey as an extension that promotes savings and convenience to consumers by searching the internet for coupons through just "1 click." PayPal advertises Honey as the "best shopping deals" and promises that "If there's a better price, we'll find it." On their website, PayPal explains that "Honey is a suite of online shopping tolls that have been part of the PayPal family for several years – helping customers discover deals and earn rewards while shipping at participating sites. It's free for anyone, (you don't have to be a PayPal customer to use the extension), and it's available on both desktop and mobile browsers. Features include coupon codes applied at checkout, an Amazon price comparison tool, price history, and a price drop tracker."



26.      However, what PayPal does not tell consumer is that alongside scraping the internet for coupons, Honey also acts to steal commissions from Influencers by replacing the Influencers' information with PayPal's in cookies that are used to track and attribute commissions just as consumers are about to complete their purchases.

27.     Thus, Honey uses some 17 million of its unwitting subscribers to perpetrate a huge scam against Influencers, who themselves have also been misled by Honey's advertisements. In fact, some of the Influencers promoted Honey on their social media platforms as a great tool for saving money on purchases.

28.     Here is how Honey works to steal influencers' commissions:

    (a)     A user clicks on an affiliate link to a product provided by the Influencer, which directs the user to a merchant's website. Once the user is on the merchant's website, the affiliate source information (i.e., a unique code identifying the Influencer as the one who sent the user to the merchant's website) is kept and tracked in a cookie.

    (b)     For example, when a user clicks on an affiliate link (https://rstyle.me/+yCeIq_XC45wfKJ04bOJQ6g&v=kOi8C5JMpiw) on YouTube video (https://www.youtube.com/watch?v=kOi8C5JMpiw), the user's web browser is redirected to



https://www.gap.com/browse/product.do?pid=519040013&vid=1&irgwc=1&ap=6&clickid=1zZ1j

hTX1xyKT8dyNP0bLWXeUks0E51-MREiR80&tid=**goaff4441350**&siteid=goafcid383244#pdp-page-content

(c)    In this URL, the affiliate information is stored in tid query parameter, which indicates the coupon code (goaff) and affiliate ID (4441350).

(d)    When this URL loads in the user's web browser, the affiliate information is also stored in a cookie named PARTNER whose value is "1|||**goaff4441350**|||6|||1736453222195|||20250109|||null|||null|||".

(e)    The user adds a product to their cart.  If a user has downloaded the Honey extension, the extension causes a pop-up to appear that says that coupons have been found and invites the user to click on the "Apply Coupons" button to test and apply the coupons.



(f)    Whether or not the Honey extension finds any discounts, when the consumer clicks on the Honey extension to "Apply Coupons", Honey removes the Influencers' unique information in the cookie and replaces it with its own information.

(g)    Specifically, when the user clicks on "Apply Coupons" in the popup, Honey's browser extension's injects source code in the user's browsers that redirects the user's browser to update the Influencer's promo code stored in the cookie with its own promo code.

(h)    Here is the screenshot of the HTTP request to https://secure-www.gap.com/shopping-bag-xapi/apply-bag-promo/, which is initiated by the source code injected by Honey's browser extension to update the promocode and affiliate information.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    (i)    The source code injected by Honey's browser extension then reloads the

17  merchant's    website    and    updated    the    PARTNER    cookie's    value    to

18  "2|||braff7229499|||6|||1736454617839|||20250109|||null|||null|||". Note that the affiliate information

19  stored in the cookie was change from **goaff4441350** to **braff7229499**. This updates the coupon as

20  well as affiliate information.

21    29.    By replacing Influencers' information in cookies with its own, PayPal is able to

22  pocket the commission money from the merchant and/or affiliate network by taking advantage of the

23  "last-click attribution" industry standard.

24    30.    The "last-click attribution" is a system whereby the affiliate who was the last to refer

25  a customer to a merchant's website before the customer clicked to purchase a product is credited with

26  the commission.

27    31.    Defendants' scheme to steal Influencers' commissions is deceptive, unfair and

28  unlawful.  Honey is not a "party" to the affiliate marketing strategy, nor does it promote the product,

but it swoops in at the last minute to get the "last slick" by manipulating cookies to collect commissions which should have been attributed influencers who did the work to promote the products.

32.    As a direct result of Defendants' actions, Plaintiffs and Class Members regularly lose commissions which they earn, and which rightfully belong to them.

**II.    Plaintiffs' Experience**

**A.    Plaintiff Oganesyan**

33.    Plaintiff Oganesyan runs a YouTube channel called TechSource that has 3.86 million followers. TechSource is dedicated to technology-related content, focusing on PC hardware reviews, custom PC builds, gaming and workstation setups and makeovers, and reviews on a wide range of tech products. TechSource regularly partners with merchants either directly or through third party affiliate networks, to promote products on his YouTube channel and to drive sales through affiliate links.

34.    Plaintiff Oganesyan has devoted tremendous effort and time to build his YouTube channel and continuously devotes time and effort to research and trying out new products before deciding whether to promote them on his platform.

35.    Over the past several years, Plaintiff noticed that his revenue from commissions had dropped, despite his viewership having increased. Plaintiff Oganesyan found this trend to be odd. He was not aware of the Honey scam until it came to public light at the end of 2024.

36.    Upon information and belief, Plaintiff Oganesyan has been damaged by Honey's interception and manipulation of his affiliate source information that resulted in Honey diverting commissions to Defendants that he rightfully earned.

**B.    Plaintiff Ely**

37.    Plaintiff Matthew Ely is a co-owner of ToastyBros, LLC, which operates a popular YouTube channel ToastyBros, as well as several other channels.

38.    ToastyBros, which has approximately 750,000 followers is a tech-oriented channel that offers PC hardware reviews and provides custom PC build guides. The other channels operated by ToastyBros, LLC are a mix of hobbyist channels and gaming focused channels and have a total of

approximately 140,000 followers.

39.    Plaintiff Ely and his colleagues invest substantial time and effort into researching and trying out hardware, appliances, and tools that they promote and finding the best deals from online merchants. They rely on affiliate links that they post on their YouTube channel pages, as well as their Instagram, Twitter, and TikTok accounts, to earn commissions and help pay for their time and effort.

40.    ToastyBros, LLC regularly partners with affiliate market networks to promote products for online merchants, and occasionally partners directly with merchants. ToastyBros, LLC posts affiliate links on all his channels and generates commission revenue by directing followers of its channels to merchant's websites.

41.    Upon information and belief, Plaintiff Ely has been damaged by Honey's interception and manipulation of his affiliate source information that resulted in Honey diverting commissions to Defendants that he rightfully earned. He was not aware of the Honey scam until it came to public light at the end of 2024.

**TOLLING OF STATUTE OF LIMITATIONS, CONCEALMENT, AND ESTOPPEL**

42.    Each unauthorized diversion of Plaintiffs' and Class Members' commissions is a separate unlawful act that triggers anew the relevant statute of limitations.

43.    Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendants' knowing and active concealment of the facts alleged herein including but not limited to its removal of Plaintiffs' and Class Members' information in cookies and replacement of that information in cookies with its own, while leading Plaintiffs and Class Members, through Honey advertisements, that Honey is just a money saving tool for consumers; and (2) the delayed discovery doctrine, as Plaintiffs and Class Members did not and could not reasonably have discovered Defendants' conduct alleged herein until shortly before the filing of this Complaint.

44.    The tools embedded in the Honey extension that allow it to track consumers' shopping activity and manipulate affiliate source information are hidden from view. Influencers have no way of knowing that the Honey extension manipulates their affiliate source information in cookies.

Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

45.     Plaintiffs were unaware of the information essential to pursue their claims, without any fault or lack of diligence on their part.

46.     All applicable statutes of limitation have also been tolled pursuant to the discovery rule.

47.     The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been on December 21, 2024, following the airing of the expose by YouTuber MegaLag.

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs, on behalf of themselves and all others similarly situated, seek relief under Federal Rules of Civil Procedure, Rule 23, on behalf of the following Class and Subclass (the "Class" or "Class Members"):

> **Nationwide Class:** All natural persons residing in the United States who have participated in an affiliate commission program with a United States online merchant and had their commissions diverted by PayPal via the Honey browser extension.

> **California Subclass:** All natural persons residing in California who have participated in an affiliate commission program with a United States online merchant and had their commissions diverted by PayPal via the Honey browser extension.

49.     Excluded from the Class and California Subclass are Defendants, their employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

50.     Plaintiffs reserve the right to revise or amend the above Class or California Subclass definition based on the discovery of new information.

51.     **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Class and California Subclass as defined and identified herein, number, on information and belief, in the tens of thousands, and are so numerous and geographically dispersed that joinder of all members of the

Class is impracticable.

52.    **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Class and California Subclass. Plaintiffs are, and have been during the relevant period, participants in affiliate commission programs with at least one United States online merchant and, upon information and belief, have had their commissions diverted by Defendants through the use of the Honey browser extension.

53.    **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and California Subclass Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members and California Subclass Members these common questions include but are not limited to:

(a)    Whether Defendants' Honey extension was designed to systematically divert commissions that were earned by Influencers;

(b)    Whether Defendants obtained express consent to or authorization for their conduct;

(c)    Whether Defendants' acts and practices violated the Electronic Communications Privacy Act 18 U.S.C. §§ 2510 *et seq.;*

(d)    Whether Defendants' acts and practices violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq.;

(e)    Whether Defendant's acts and practices violated Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

(f)    Whether Defendants' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq.*;

(g)    Whether Defendant's acts and practices violated the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(h)    Whether Defendants' commission diversion scheme is unfair;

(i)    Whether Defendants' commission diversion scheme is unlawful;

(j)    Whether Defendants were unjustly enriched;

(k)     Whether Defendants' acts and practices harmed Plaintiffs, Class Members and California Subclass Members;

(l)     Whether Plaintiffs, Class Members, and California Subclass Members are entitled to damages and other monetary relief, and if so, what is the appropriate measure of damages or other monetary relief;

(m)     Whether Plaintiffs, Class Members, and California Subclass Members are entitled to declaratory relief and/or injunctive relief to enjoy the unlawful conduct alleged herein; and

(n)     Whether Plaintiffs, Class Members, and California Subclass Members are entitled to reasonable attorneys' fees and costs.

54.     **Adequacy of Representation (Rule 23(a)(4))**: Plaintiffs will fairly and adequately protect the interests of the Class and California Subclass. Plaintiffs' interests do not conflict with those of the Class, they are not subject to any unique defenses, and have retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and California Subclass. Plaintiffs and counsel anticipate no difficulty in managing the litigation of this case as a class action.

55.     **Predominance and Superiority (Rule 23(b)(3)):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class and California Subclass, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members and California Subclass Members to individually redress the wrongs done to them and individual Class Members

and California Subclass Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members and California Subclass Members to bring individual actions to recover money from Defendants, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiffs anticipate no difficulty in the management of this action which would preclude its maintenance as a class action.

56.     Plaintiffs reserve the right to add representatives for the Class and California Subclass, provided Defendants are afforded an opportunity to conduct discovery as to those representatives.

**FIRST CAUSE OF ACTION**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2510, et seq.**
**(By Plaintiffs on behalf of themselves and the Class)**

57.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

58.     The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 et seq., makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

59.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

60.     The transmission of Influencers' unique affiliate source data (i.e., unique ID and coupon code) to the merchant (via the cookie generated by consumer action) qualifies as Plaintiffs' and Class Members' "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

61.     By allowing the Honey browser extension to intercept and surreptitiously manipulate Influencers' unique ID and coupon code contained in a cookie on consumers' web

browsers, Defendants intentionally intercepted and/or endeavored to intercept the contents of "electronic communications" in violation of 18 U.S.C. § 2511(1)(a).

62.     No party to the electronic communication alleged herein consented to Defendants' interception and manipulation of the electronic communication. Nor could they because Defendants' actions were surreptitious.

63.     18 U.S.C. § 2511(2)(d) provides an exception to 18 U.S.C. § 2511(1), under which: "It shall not be unlawful under this chapter [18 USC §§ 2510 et seq.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State*." (emphasis added).

64.     Defendants do not meet the requirements of the "party exception" to the ECPA because, as detailed herein, the electronic communications intercepted by Defendants were intercepted as part of Defendants' tortious practice of converting commissions and interfering with Plaintiffs' and Class Members' economic advantage, that is also in violation of federal and state laws, including Computer Fraud and Abuse Act, 18 U.S.C. § 1030, California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq., California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq*., and Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, as alleged herein.

65.     Accordingly, Defendants violated the ECPA each time they intercepted Plaintiffs' and Class Members' electronic communications via the Honey extension.

66.     Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members, have been damaged by the interception of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by PayPal as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation

costs reasonably incurred.

67.    Plaintiffs, on behalf of themselves and the Class seek relief as further described below.

**SECOND CAUSE OF ACTION**
**Violation of the Computer Fraud and Abuse Act**
**18 U.S.C. §§ 1030, et seq.**
**(By Plaintiffs on behalf of themselves and the Class)**

68.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

69.    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) makes it unlawful to: "knowingly and with intent defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value…"

70.    18 U.S.C. § 1030(g) provides a private right of action to "[a]ny person who suffers damage or loss by reason of a violation of this section[.]"

71.    Consumers' computers are used in interstate and foreign commerce or communication.

72.    Defendants violated § 1030(a)(4), by knowingly, and with intent to defraud Plaintiffs and Class Members, accessed cookies on consumers' browsers containing Plaintiffs' and Class Members' data, via the Honey extension, and altered that data without authorization or by exceeding authorized access, and by means of such conduct furthered the intended fraud and obtained commissions earned by Plaintiffs and Class Members.

73.    Defendants' access was without authorization or in excess of authorized access, because the purpose of the access was to enact a commission diversion scheme, whereby Defendants surreptitiously used consumers' computers to defraud Plaintiffs and Class Members by altering Plaintiffs' and Class Members' data to steal their commissions.

74.    Plaintiffs and Class Members have suffered damage and loss, aggregating at least $5,000 in value in any 1-year period during the relevant period, including, without limitation, their earned commissions, as a result of Defendants' violation of 18 U.S.C. § 1030.

75.    Defendants' unlawful access to and theft of Plaintiffs' and Class Members' commissions through unauthorized access of the data on consumers' computers caused Plaintiffs and Class Members irreparable injury. Unless restrained and enjoined, Defendants will continue such acts. Plaintiffs' and Class Members' remedies at law are not adequacy to compensate them for these threatened injuries, entitling Plaintiffs and Class Members to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

76.    Plaintiffs, on behalf of themselves and the Class seek relief as further described below.

**THIRD CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code §§ 17200 et seq.**
**(By Plaintiffs on behalf of themselves and Class Members)**

77.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

78.    The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.  California Business & Professions Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.

79.    Defendants' acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful and unfair business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, et seq.

80.    The UCL draws upon various sources of law to establish regulations and standards for business practices within California. Defendants have engaged and continue to engage in business acts and practices that are unlawful because they violate federal and state laws, including Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, et seq., Computer Fraud and Abuse Act, 18 U.S.C.

§§ 1030 et seq., California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq.,* and Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, as set forth in this complaint.

81.     Defendants' acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and Class Members. Defendants covertly accessed and misused Plaintiffs' and Class Members' affiliate source information by replacing it with their own data, with no corresponding benefit to Plaintiffs and Class Members. And, because Defendants' Honey extension was installed on consumers' browsers and the Honey extension acted in a covert manner, Plaintiffs and Class Members could not have avoided the harm.

82.     Defendants should be required to cease their unfair and/or illegal interception, use, and manipulation of Plaintiffs' and Class Members' communications and information. Defendants have reaped and continue to reap unjust profits and revenues in violation of the UCL at the expense of Plaintiffs and Class Members.

83.     "Actions for relief" under the UCL may be brought by various government officials and "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

84.     Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' acts and practices because they lost commissions that rightfully belonged to them as the parties whose marketing and drove consumers to merchant's website to purchase products.

85.     To protect Plaintiffs and Class Members from Defendants' unfair and/or unlawful practices, Plaintiffs seek an order from this Court enjoining Defendants from unlawfully intercepting and manipulating Plaintiffs' and Class Members' affiliate source data.

86.     Plaintiffs lack an adequate remedy at law because the ongoing harms from Defendants' actions and practices must be addressed by public injunctive relief and, due to the ongoing and nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

87.     This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on the general public. Private enforcement is necessary and

places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendants under Cal. Code of Civil Procedure § 1021.5 and other applicable law.

88.    Plaintiffs seek relief as further described below.

### THIRD CAUSE OF ACTION
**Restitution and Unjust Enrichment**
**(By Plaintiffs on behalf of themselves and the Class)**

89.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

90.    Through its commission diversion scheme, as described above, Defendants receive a benefit, in the form of commissions for sales that were not generated by its referral or advertisement, but by the referrals or advertisements of unrelated to Defendants' influencers, bloggers, and other content creators.

91.    In light of Defendants' conduct, it would be unjust for Defendants to retain the benefits they obtained from merchants and affiliate networks in the form of commissions they diverted from influencers, bloggers, and other content creators, i.e., Plaintiffs and Class Members.

92.    Defendants have been unjustly enriched by the payment of diverted commissions and should be required in equity to make restitution of these payments to the influencers, bloggers, and other content creators from whom they were diverted.

93.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### FOURTH CAUSE OF ACTION
**Interference with Prospective Economic Advantage**
**(By Plaintiffs on behalf of themselves and the Class)**

94.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

95.     Plaintiffs and Class Members were and continue to enjoy economic relationships with merchants and/or affiliate networks whereby Plaintiffs and Class Members refer their followers to the merchants' websites by advertising merchants' products to the audiences on their social media accounts. In return, the merchants, directly or through affiliate networks, pay Plaintiffs and Class Members commissions on sales they generate.

96.     Defendants knew and continue to know that there is an economic relationship that exists between Plaintiffs and Class Members, on the one hand, and merchants and/or affiliate networks, on the other hand.

97.     Defendants intentionally and unlawfully interfere with and disrupt that economic relationship via the Honey extension, which intercepts and manipulates affiliate source codes that Plaintiffs and Class Members provide to merchants and/or affiliate networks, for the purpose of sale and commission attribution. As alleged above, the Honey extension offers the potential to customers to save money on their purchases by applying coupons, and at the same time works in the background to remove the Plaintiffs' and Class Members' affiliate source information from the tracking cookie and replaces it with its own information. This removal and replacement of Plaintiffs' and Class Members' data in the cookie results in commissions generated by Plaintiffs' and Class Members' efforts being diverted to Defendants.

98.     Plaintiffs and Class Members were harmed by Defendants' actions in that they were deprived of their earned commissions.

99.     Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**FIFTH CAUSE OF ACTION**
**Conversion**
**(By Plaintiffs on behalf of themselves and the Class)**

100.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

101.     Plaintiffs and other Class Members had the right to commissions that they earned from online merchants by referring customers to merchants' websites.

102.    Defendants intentionally and substantially interfered with Plaintiffs' and Class Members' personal property by diverting commissions to themselves via the Honey extension that should rightfully go to Plaintiffs and Class Members.

103.    Defendants' diversion and taking of Plaintiffs' and Class Members' rightfully earned commissions was done without authorization.

104.    Plaintiffs' and Class Members' rightful commission sums diverted by Defendants to themselves are specific sums capable of identification.

105.    Defendants' actions have deprived Plaintiffs and Class Members of their rightful commissions, causing them significant economic harm.  Plaintiffs and Class Members lost income which they would have otherwise received, but for Defendants' wrongful conduct.

106.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### SIXTH CAUSE OF ACTION
**Violation of the California Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**
**(By Plaintiff Oganesyan, on behalf of himself and the California Subclass)**

107.    Plaintiff Oganesyan re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

108.    Penal Code § 502(c)(1) makes it an offense when a person: "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data."

109.    Defendants violated § 502(c)(1) when they accessed the Plaintiff Oganesyan's and California Subclass Members' affiliate source information from the tracking cookie in order to replace it with their own information and thereby defraud and deceive or wrongfully obtain money or property belonging to Plaintiff and California Subclass Members.

110.    Cal. Penal Code § 502(c)(4) makes it an offense when a person: "Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."

111.    Defendants violated § 502(c)(4) when they accessed the Plaintiff Oganesyan's and California Subclass Members' affiliate source information from the tracking cookie and without permission deleted Plaintiff Oganesyan's and California Subclass Members' affiliate source information from the tracking cookie, added Honey information to the tracking cookie, and thereby altered and destroyed data belonging to Plaintiff Oganesyan and California Subclass Members.

112.    Penal Code § 502(e)(1) provides a private right of action for "the owner or lessee of the…data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)[.]"

113.    Plaintiff Oganesyan and California Subclass Members were the owners of the data who suffered damage or loss as a result of Defendants' conduct. Defendants' acts and practices have deprived Plaintiff Oganesyan and California Subclass Members of their ability to receive their commissions.

114.    Plaintiff Oganesyan, on behalf of himself and California Subclass, seeks compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief.

115.    Plaintiff Oganesyan and California Subclass Members have also suffered irreparable and incalculable harm and injuries from Defendants' violations. The harm will continue unless Defendants are enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

116.    Plaintiff Oganesyan and California Subclass Members are also entitled to punitive or exemplary damages pursuant to Penal Code § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff Oganesyan and California Subclass Members are also

entitled to recover their reasonable attorneys' fees under § 502(e)(2).

117.    Plaintiff Oganesyan, on behalf of himself and the California Subclass, seeks relief as further described below.

**SEVENTH CAUSE OF ACTION**
**Violation of the Cal. Invasion of Privacy Act**
**Cal. Penal Code §§ 630 *et seq*.**
**(By Plaintiff Oganesyan, on behalf of himself and the California Subclass)**

118.    Plaintiff Oganesyan re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

119.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500) . . ."

120.    Cal. Penal Code § 637.2(a) provides a private right of action to "[a]ny person who has been injured by a violation of this chapter [who] may bring an action against the person who committed the violation for the greater of [$5,000 per violation or three times the actual damages]."

121.    Defendants are each a "person" within the meaning of Cal. Penal Code § 631.

122.    Plaintiff Oganesyan's and California Subclass Members' communications with online merchants (via a cookie generated by consumer action) were intended to be confined to these parties, and Defendants were neither an intended party to nor authorized to intercept these

communications.

123.    Despite not having any authorization from Plaintiff Oganesyan and California Subclass Members, Defendants intercepted these communications to learn the content of and manipulate those communications while in transit or in the process of being sent or received.

124.    Defendants' conduct, as described above, violated Cal. Penal Code § 631.

125.    Under Cal. Penal Code § 637.2, Plaintiff Oganesyan and California Subclass Members are entitled to recover the greater of: (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial.

126.    Plaintiff Oganesyan, on behalf of himself and the California Subclass, seeks relief as further described below.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgement as follows:

127.    An order appointing Plaintiffs as the Class Representatives;

128.    An order certifying the Class and California Subclass as requested and appointing the undersigned attorneys as Class Counsel;

129.    An order declaring that Defendants' conduct violates the laws referenced herein;

130.    An order awarding actual, statutory, punitive, consequential damages in an amount to be determined at trial;

131.    An injunction forbidding Defendants from intercepting and manipulating affiliate links in a manner that diverts commissions to Defendants for sales they did not generate;

132.    Disgorgement of all ill-gotten profits and restitution of all revenues obtained from Plaintiffs and Class Members as a result of Defendants' unfair and unlawful conduct;

133.    An award of reasonable attorneys' fees and costs of suit, as provided by law;

134.    An award of pre- and post-judgment interest as provided by law; and

135.    An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

1

### **DEMAND FOR JURY TRIAL**

2       Plaintiffs, on behalf of themselves and all other members of the Class and California

3  Subclass, hereby demand a jury trial on all issues so triable.

4

5
       Dated: January 15, 2025                        Respectfully submitted,
6

7                                               _s/ Julian Hammond_____
                                               JULIAN HAMMOND (SBN 268489)
8                                              jhammond@hammondlawpc.com
                                               POLINA BRANDLER (SBN 269086)
9                                              pbrandler@hammondlawpc.com
                                               ARI CHERNIAK (SBN 290071)
10                                             acherniak@hammondlawpc.com
                                               HAMMONDLAW, P.C.
11                                             1201 Pacific Ave, 6th Floor
                                               Tacoma, WA 98402
12                                             (310) 601-6766 (office)
                                               (310) 295-2385 (fax)
13

14                                             DOUGLAS J. MCNAMARA (*pro hac vice
                                               forthcoming*)
15                                             dmcnamara@cohenmilstein.com
                                               KARINA G. PUTTIEVA (SBN 317702)
16                                             kputtieva@cohenmilstein.com
                                               COHEN MILSTEIN SELLERS & TOLL PLLC
17                                             1100 New York Ave. NW, 8th Floor
                                               Washington, DC 20005
18                                             Telephone: (202) 408-4600
                                               Facsimile: (202) 408-4699
19

20                                             *Attorneys for Plaintiffs and the Putative Class*

21

22

23

24

25

26

27

28